## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **DINA DELLA DUCATA,** | |
|       **PLAINTIFF,** | **Civil Action No.: _____** |
|   **v.** | |
| **FAMILY SERVICE ASSOCIATION OF BUCKS COUNTY,** | **JURY TRIAL DEMANDED** |
| **GARY LUX,** | |
| **DEBORAH VAN AKEN,** | |
| **SUBRENIE THOMAS SMITH,** | |
|    **and** | |
| **JOSEPH STOLL,** | |
|      **DEFENDANTS.** | |

## COMPLAINT AND JURY DEMAND

Plaintiff Dina Della Ducata, by and through her undersigned attorneys, Bell & Bell LLP,

hereby files the following Complaint and Jury Demand ("Complaint").

## PRELIMINARY STATEMENT

1.    This is an action for an award of damages, punitive damages, and other relief on behalf of

Plaintiff Dina Della Ducata (hereinafter "Ms. Della Ducata" or "Plaintiff"), a former

employee of Family Service Association of Bucks County ("FSA"). Ms. Della Ducata

has been harmed by FSA's harassment and discrimination on the basis of her sex and

national origin, and was retaliated against for her complaints of harassment and

discrimination, culminating in her wrongful termination on August 28, 2020.  FSA also

breached its contract with Ms. Della Ducata with respect to severance pay, COBRA reimbursement and accrued paid time off owed to her, and has not paid Ms. Della Ducata her earned wages including severance pay, COBRA reimbursement and accrued paid time off in violation of the Pennsylvania Wage Payment and Collection Law.  Defendants Gary Lux - former Board President, Deborah Van Aken – current Board President, Subrenie Thomas Smith – 2nd Vice President, and Joseph Stoll - Treasurer, were decision makers with respect to the decision to withhold Ms. Della Ducata's earned wages.

2.    This action arises under Title VII of the Civil Rights Act of 1964, as amended by the Civil Rights Act of 1991, 42 U.S.C § 2000(e) et seq. ("Title VII"), the Pennsylvania Wage Payment and Collection Law, 43 Pa. C. S. § 260.1, et seq. ("WPCL") and Pennsylvania common law.

## JURISDICTION

3.    This Court has original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States pursuant to 28 U.S.C. §§ 1331 and 1391.

4.    The jurisdiction of this Court is also invoked pursuant to 28 U.S.C. § 1343(4), which grants the District Court original jurisdiction in any civil action authorized by law to be commenced by any person to recover damages to secure equitable or other relief under any act of Congress providing for the protection of civil rights.

5.    This Court has supplemental jurisdiction over any Pennsylvania state law claims alleged herein pursuant to 28 U.S.C. § 1367.

6.    All conditions precedent to the institution of this suit have been fulfilled. On January 22, 2021, Plaintiff timely filed a Charge of Discrimination with the United States Equal Employment Opportunity Commission ("EEOC"), which was dual-filed as a Complaint

with the Pennsylvania Human Relations Commission ("PHRC").  On May 10, 2021, the EEOC issued a Notice of Right to Sue to Plaintiff. This action has been filed within ninety (90) days of Plaintiff's receipt of said Notice.[1]

## VENUE

7.  This action properly lies in the Eastern District of Pennsylvania, pursuant to 28 U.S.C. § 1391(b).

8.  This action properly lies in the Eastern District of Pennsylvania because significant activities associated with the claims alleged took place in this judicial district, Plaintiff performed her work for Defendant in this judicial district, Plaintiff was terminated in this judicial district, and the claims arose in this judicial district.

## PARTIES

9.  Plaintiff Dina Della Ducata is an adult female of Italian origin and ethnicity who resides in Cherry Hill, New Jersey, and the United States of America.

10.  Defendant Family Service Association of Bucks County is a non-profit organization in Bucks County, Pennsylvania, with an address of 4 Cornerstone Drive, Langhorne, PA 19047.

11.  Defendant Gary Lux is the former President of the Board of Directors of FSA who was a decision-maker with respect to the decision to withhold Ms. Della Ducata's earned but unpaid wages including paid time off, COBRA reimbursement and severance pay.

---

[1] It has been less than one year since this matter was dual-filed with the Pennsylvania Human Relations Commission ("PHRC") with respect to Ms. Della Ducata's claims that arise pursuant to the Pennsylvania Human Relations Act, as amended, 43 P.S. § 951 et seq. ("PHRA").  Ms. Della Ducata will seek to amend her Complaint to add her PHRA claims after it has been more than one year since her dual-filing with the PHRC.

12.     Defendant Deborah Van Aken is the former 1st Vice President and current President of the Board of Directors of FSA who was a decision-maker with respect to the decision to withhold Ms. Della Ducata's earned but unpaid wages including paid time off, COBRA reimbursement and severance pay.

13.     Defendant Subrenie Thomas Smith is the 2nd Vice President of the Board of Directors of FSA who was a decision-maker with respect to the decision to withhold Ms. Della Ducata's earned but unpaid wages including paid time off, COBRA reimbursement and severance pay.

14.     Defendant Joseph Stoll is the Treasurer of the Board of Directors of FSA who was a decision-maker with respect to the decision to withhold Ms. Della Ducata's earned but unpaid wages including paid time off, COBRA reimbursement and severance pay.

15.     Defendant FSA does significant business within the Commonwealth of Pennsylvania.

16.     At all relevant times, Defendant FSA is and has been an employer employing more than fifteen (15) employees.

17.     At all relevant times, employees of Defendant FSA acted as agents and servants for Defendant FSA.

18.     At all relevant times, employees of Defendant FSA were acting within the scope of their authority and in the course of employment under the direct control of Defendant FSA.

19.     At all times material hereto, Defendant FSA acted by and through its authorized agents, servants, workmen, and/or employees acting within the course and scope of their employment with Defendant FSA and in furtherance of Defendant FSA's business.

20.  This cause of action arose out of transactions or occurrences that took place in whole or in part in Bucks County, Pennsylvania. Defendants conduct substantial business within Bucks County, Pennsylvania.

21.  This Honorable Court has personal jurisdiction over the Defendants.

## FACTS

22.  FSA is a non-profit agency whose purpose is to maintain, strengthen, and/or enhance individuals and families and their social and psychological functioning.

23.  Ms. Della Ducata is a highly experienced non-profit executive with a proven track record of managing all aspects of non-profit business operations including, but not limited to, overseeing employment and human resources, information technology, strategic planning, facilities management, risk management, administration, government grants, contracts, financial management, community and governmental relations, external partnerships, and clinical and non-clinical program management.

24.  On or about October 9, 2018, Ms. Della Ducata was hired by FSA as its Chief Executive Officer.

25.  In addition to a starting salary of $195,000, Ms. Della Ducata also received and/or was eligible for health, dental, vision and disability benefits, the Company 401(k) plan with matching and vesting, a Supplemental Retirement Plan, a car allowance, 100% of paid cellphone for business use, a term life insurance policy, a $250,000 supplemental executive life insurance and other benefits.

26.  Ms. Della Ducata's offer letter, in addition to the above-described terms, entitled her to a severance payment of six months of base salary and six months of reimbursement for COBRA continuation coverage in the event she was not terminated for cause.

27. Ms. Della Ducata's offer letter entitled her to paid time off including vacation pay that Ms. Della Ducata was entitled to carry over from year to year to the extent it was not used during the year it was accrued, for a period of 24 months.

28. Ms. Della Ducata began her employment with FSA as its Chief Executive Officer and Bucks Villa Administrator on December 10, 2018.

29. Ms. Della Ducata's husband, Salvatore Della Ducata, was also employed part-time by FSA as the Project Manager of FSA beginning in May 2019 and later promoted in May 2020 to a full-time position as Facilities and Project Manager.

30. Despite her loyalty and consistent performance, however, Ms. Della Ducata was subjected to harassment and discrimination on the basis of her sex and national origin, and was retaliated against for her complaints about harassment and discrimination, culminating in her wrongful termination on August 28, 2020.

31. Throughout her employment with FSA, Ms. Della Ducata regularly met or exceeded performance expectations and received positive feedback from certain Board members, which was acknowledged and recognized on multiple occasions.

32. Ms. Della Ducata acted, at all times, in accordance with all provisions of her Employment Agreement and excelled in her position.

33. In fact, as noted in Ms. Della Ducata's Performance Review for the period December 2018 through June 2019, Ms. Della Ducata was a "rapid learner and had excellent working knowledge" of the FSA programs, her experience in Behavioral Health was "evident" and she was "able to develop solutions or new approaches based on this experience," she had "clearly demonstrated the ability to address tough and complex

issues and make timely decisions," and she had "engaged her leadership team and empowered them in making needed changes."

34.   The June 2019 Performance Review also commended Ms. Della Ducata in accomplishing so many tasks in compliance with local, state, and federal regulatory and legal requirements, which effectively managed the FSA's reputation and risks while maintaining FSA's strong commitment to compliance.

35.   As Chief Executive Officer of FSA, Ms. Della Ducata made numerous significant contributions to FSA, including, but not limited to:

- Successfully navigating leadership responsibilities following the sudden passing of a beloved legacy leader of over thirty years with minimal transition planning within a climate of deep mourning, and a history of deficits followed by the Covid-19 Pandemic;

- Strengthening the leadership team by hiring seasoned staff in C-Suite and other key leadership positions;

- Establishing policies and protocols for operations to replace outdated systems and/or creating new systems and procedures where gaps existed;

- Streamlining programs and services to ensure financial solvency and effective programming;

- Reducing the deficit in the outpatient psychiatric program for a net savings of over $400,000 in Fiscal Year 2018/2019.

- Raising over $250,000 for the Emergency Homeless Shelter during the Covid-19 Pandemic and other major fundraising activities throughout her employment;

- Successfully navigating the organization and keeping the doors open for onsite and teleservices throughout the Covid-19 Pandemic;

- Negotiating and implementing a major contract with Children's Hospital of Philadelphia for tele-psychiatric services;

- Applying and solidifying approximately $1 million in Federal Cares Act grants to be applied to new and/or expanding programs, services and capital improvements/enhancements;

- Securing $1.2. million through a PPP loan;

- Implementing major technology upgrades and capital improvements as a result of approved Federal Cares Act Grants and private foundations and partnerships;

- Negotiating with Magellan to provide consistent advanced monthly financial payments throughout the Pandemic (APA); and

- Improving overall financial solvency for both FY18/19 and FY19/20, ending FY 19/20 with a positive variance over budget and a very strong cash position.

36.   Moreover, Ms. Della Ducata held a Board retreat in Fall 2019 to address Board Governance, and brought in a presenter from La Salle Non Profit University who provided training on Board Governance, including committee structures.

37.   Approximately 80% of the Board attended the retreat and the feedback was overwhelmingly positive.

38.   As a result of what was learned at the retreat, the Board decided to review the current committee structures and revise the Board Committee Charters.

39.     In addition to her long list of accomplishments, Ms. Della Ducata worked at least 37.5 hours almost every single week. As her timecards reflect, she was working late into the evening on most nights, as well as weekends and holidays throughout her employment.

40.     Ms. Della Ducata also exercised excellent judgment during her employment with FSA and demonstrated her ability to form and maintain successful relationships with FSA staff, vendors and third parties, including the following:

- Ms. Della Ducata received major COVID-19 grants for FSA, totaling over $800,000, due to her strong relationship with Congressman Brian Fitzpartick (who also supported, spoke, and donated his time to all FSA events).

- Ms. Della Ducata was appointed to the CEO advisory council for the National Alliance for Strong Communities and Families, which was a very prestigious appointment that occurred in the early period of Ms. Della Ducata's employment with FSA.

- Ms. Della Ducata was voted in by other Pennsylvania CEOs to be the President of the Pennsylvania Chapter of the Alliance of Strong Families and Communities.

- Ms. Della Ducata formed strong relationships with Bucks County Opportunity Council, whose CEO spoke at the FSA Board retreat and Virtual Shelter Benefit 2020.

- Ms. Della Ducata facilitated meetings with the area Family Service organizations and other CEOs in Bucks, Philadelphia, Montgomery and Chester Counties.

- Ms. Della Ducata was a guest speaker at various community venues, including the Bucks County Women's Alliance and local Rotary Clubs.

- Ms. Della Ducata networked with area hospital CEOs and their senior staff.

- Ms. Della Ducata closed a contract with The Children's Hospital of Philadelphia due to her strong professional contacts and relationships with the physicians at the Hospital.

- Ms. Della Ducata hosted a conference run by St. Mary's Hospital that brought together local Bucks County community partner and other social service organizations.

- Ms. Della Ducata established relationships with the two new County Commissioners who in turn also supported FSA's annual fundraisers and events.

- FSA staff morale was up and numerous staff appreciation events were held, including wellness events, holiday parties, and ice cream socials.

- As a result of her strong relationship with Maghellan Insurance Company, new case management rates were negotiated to ensure future financial solvency, and throughout the pandemic, advance payment adjustments were approved by Maghellan.

41.   There were no issues whatsoever with Ms. Della Ducata's performance, as she made significant accomplishments during her tenure, the Board had never complained about Ms. Della Ducata's work performance, and Ms. Della Ducata participated in any and all Board meetings as requested.

42.   Based on her overall performance assessment for 2019, Ms. Della Ducata received a $3,000 cash bonus.

43.   In addition, in June 2019, FSA voted to increase Ms. Della Ducata's salary to $200,000, effective July 1, 2019.

44.   In July 2020, Ms. Della Ducata's salary was increased to $206,000, and she was awarded a $3,500 bonus.

45.   Despite her excellent performance and tremendous accomplishments, after a change in the Board Executive Committee of FSA, Ms. Della Ducata was harassed and discriminated against on the basis of her sex and national origin by certain FSA Board members.

46. Specifically, in addition to numerous harassing and offensive comments directed at Ms. Della Ducata based on her sex and national origin, the Board engaged in numerous other acts of discrimination and harassment, including, but not limited to, giving Ms. Della Ducata unjustifiably low performance scores despite her unquestionable accomplishments, failing and/or refusing to meet Ms. Della Ducata regarding time sensitive matters, failing and/or refusing to respond to Ms. Della Ducata's communications, and barring Ms. Della Ducata from implementing reorganization plans included in FY 20/21 Board approved budgets.  FSA also held board meetings to make decisions on daily operational matters without Ms. Della Ducata's input or presence.

47. During Ms. Della Ducata's employment, there were 20 Board members and the vast majority were male.

48. Ms. Della Ducata was marginalized and harassed on the basis of her sex by being referred to as a "girl," and was consistently undermined by certain Board members.

49. In fact, when Ms. Della Ducata hired a highly qualified senior leader she was asked "Did you hire another Philly girl?."

50. This demonstrated the Board members' disdain for and discriminatory animus towards the female sex, despite Ms. Della Ducata's significant experience and professionalism.

51. Moreover, because Ms. Della Ducata is of Italian origin and ethnicity, she was repeatedly subjected to offensive and harassing comments by various FSA Board members, such as being called "a Philly girl" with "Philly style" and "Philly resources," "a Jersey girl" and that she had an "accent" that was "too strong," which they ridiculed.

52.  All of the comments directed to Ms. Della Ducata regarding "Philly" and "Jersey", as well as her accent, were in reference to Ms. Della Ducata's Italian origin and ethnicity.

53.    The Board further disapproved of Ms. Della Ducata's managerial style, which they deemed "harsh and abrasive," and which they associated with her national origin.

54.    These comments demonstrated the Board's discriminatory animus against Ms. Della Ducata on the basis of her national origin and her sex.

55.    The Board also made aggressive efforts to interfere with and hinder Ms. Della Ducata's performance of her responsibilities.

56.    These Board members were used to a prior, meek and passive female CEO whom they could control and manipulate– which is how they preferred females to manage and lead FSA.

57.    Faced with a strong and independent thinking female, various Board members, which consisted almost entirely of older White males, reacted negatively and clearly could not handle the prospect of letting such a female, with a strong "Philly" personality (which was, in reality, a reference to Ms. Della Ducata's Italian origin), actually manage the day-to-day operations of FSA and Bucks Villa, per her job duties.

58.    To the extent the Board had a difficult time with Ms. Della Ducata's attempts to run the organization effectively and efficiently in the day-to-day operations, as was her responsibility to do so as the hired CEO, it was solely on the basis that the Board held a discriminatory animus against an experienced, qualified and competent female and resented Ms. Della Ducata for not allowing the Board full reign over all daily operations.

59.    This further evidences the discriminatory animus the Board has against females by its continuing belief that all women should be meek and passive, and its obvious pattern and practice of exerting its control and influence over such females.

60.   The newly elected Board President and Executive Committee members of the Board made clear that they did not want to work with Ms. Della Ducata and that they wanted to be in charge and handle all of Ms. Della Ducata's job responsibilities, including, but not limited to, running the day-to-day operations, directing staff, and making their own operating and clinical decisions.

61.   The Board sought to control and exert all influence over Ms. Della Ducata as it had with the prior CEO, during whose tenure Board members were permitted to roam the halls, interact with staff, get involved with staffing decisions, direct daily financial expenditures, and engage in various other daily operational and administrative matters. Unfortunately, this excessive involvement, which included such trivial matters as spending time with staff deliberating on the color of napkins for a fundraising event, used staff time unnecessarily and was disruptive to the efficiency of the day-to-day operations. It further caused confusion with staff as to conflicting work assignments and priorities given by Board members versus their supervisors.

62.   Despite the clear responsibilities set forth in Ms. Della Ducata's job description, the Board expected to handle all such responsibilities instead of Ms. Della Ducata.

63.   The Board members inserted themselves into virtually every aspect of Ms. Della Ducata's role (as much as they could), and sought to eliminate and/or exclude Ms. Della Ducata from involvement in various aspects of her role.

64.   Ms. Della Ducata sent several emails to the Board members regarding their refusal to work with her and requesting meetings, including for help on how to work with specific Board members and the Board as a whole, but received no response.

65.    Instead, Ms. Della Ducata received hostile, demeaning and aggressive emails from members of the Board.

66.    In just one example of the harassing and inappropriate behavior, and clear discriminatory animus of certain Board members against Ms. Della Ducata, Ms. Della Ducata received an email from Fred Hessenthaler, Board member and chairperson for HR Committee of the board, requesting a salary for a particular employee.

67.    Ms. Della Ducata responded that it was her understanding that individual staff salaries were not to be disclosed for privacy reasons, but requested further information and stated that she would be happy to provide assistance with the request.

68.    Mr. Hessenthaler responded rudely and curtly, demanding to know the salary, and ending his email that: "I am the HR Chair and entitled to some types of information and salary is one. If you are questioning my ability to keep matters quiet and confidential, then both you and I have a problem that needs to be resolved, pronto."

69.    In July 2020, Gary Lux was appointed Board President.

70.    In his very first email communication, Mr. Lux threatened Ms. Della Ducata that if she did not like the way they were doing things, she had "other options" – i.e., to leave her employment.

71.     Meanwhile, at or about the same time, despite Ms. Della Ducata having received an architect proposal and having engaged in discussions with a civil engineer and Township zoning, she was purposefully excluded from the Board discussion and vote on the project to expand the shelter despite the Board's prior request to her to explore the project and report back to the board when details were ready.  In addition, Ms. Della Ducata was told that as a result of the Board discussion and vote from which she had been excluded, the

Board would be forming a committee for the project and she would not be included as a member of the new committee.

72. It was clear that these Board members had a discriminatory animus against Ms. Della Ducata and simply would not work with her.

73. FSA was in an excellent cash position during Ms. Della Ducata's tenure.

74. Due to Ms. Della Ducata's tremendous performance, FSA acquired over $1 million in grants and had successfully managed Covid-19 during the pandemic, with no outbreaks.

75. The Board never complained about Ms. Della Ducata's work performance.

76. However, she received unjustifiably low scores, such as 1, by those who held the discriminatory animus against her, demonstrating that the discriminatory animus drove those individual's ratings and not objective criteria, qualifications and/or assessments.

77. There was no information given regarding the select board members' unjustifiably low scores or how to improve them, other than to note that Ms. Della Ducata needed "soft skills," which undoubtedly would not have been communicated by the Board to a male CEO.

78. Ms. Della Ducata requested specific supporting examples of "soft skills" that needed improvement, so that she could better understand how to adjust her leadership style, but the Board President at that time, Joseph Bondi, stated that no further details would be provided regarding the review.

79. The FSA Board also engaged in other discriminatory and harassing acts designed to undermine Ms. Della Ducata and interfere with her job performance due to their discriminatory animus against her, including, but not limited to:

- Failing and/or refusing to meet regarding time sensitive matters and/or approve strategic issues for which Ms. Della Ducata was responsible;

- Excluding Ms. Della Ducata from Board and Committee meetings where her presence was essential and required;

- Failing and/or refusing to respond to communications from Ms. Della Ducata and/or to meet with her to discuss concerns she had raised regarding FSA;

- Failing and/or refusing to respect Ms. Della Ducata's authority to make personnel decisions;

- Undermining Ms. Della Ducata with FSA staff by "reconsidering" an employment decision and agreeing to retain an employee whose services were needed on a limited basis, which not only undermined Ms. Della Ducata's authority and responsibility regarding staff management and oversight, but also created budgetary issues for FSA;

- Failing and/or refusing to support Ms. Della Ducata in development, donor cultivation, fundraising, and in her attempts to advance other goals of FSA by barring her from engaging qualified outside consultants to assist in achieving those goals;

- Failing and/or refusing to respect Ms. Della Ducata's role as CEO of FSA by assigning tasks directly to her staff and/or independent contractors and overriding her directives, which further undermined Ms. Della Ducata's authority and encouraged staff to circumvent Ms. Della Ducata as FSA's Chief Executive Officer and enlist the Board to override her authority;

- Barring Ms. Della Ducata from implementing the Board approved budgetary and reorganization plans for FSA, which created conflicting guidance and further undermined Ms. Della Ducata's ability to effectively lead FSA operationally, strategically and financially;

- Failing and/or refusing to include Ms. Della Ducata in a wide array of operational and strategic issues, which denied her the opportunity to lead FSA as she was tasked to do;

- Going directly to the County Commissioner and other County officials about grants affecting the operations of FSA and purposefully excluding Ms. Della Ducata from such discussions, approvals and implementation project plans; and

- Making other significant decisions affecting FSA without Ms. Della Ducata's input.

80. In addition to being discriminatory and harassing, the aforementioned wrongful acts of the FSA Board violated Ms. Della Ducata's employment agreement, were a breach of their fiduciary duties and duty of good faith and fair dealing, and ran afoul of the FSA By-Laws and Board Committee Charters.

81. Notwithstanding the foregoing, and despite FSA's severe and pervasive harassment and attempts to undermine and hinder Ms. Della Ducata in her work, Ms. Della Ducata continued to perform excellently.

82. In fact, Ms. Della Ducata's exemplary work performance and professionalism was consistently recognized by political and community leaders, donors, and other stakeholders.

83.  Beginning in June 2020, Ms. Della Ducata repeatedly complained about the discriminatory and harassing treatment to Fred Hesenthaler, the Human Resources Chair of the Board and to the outgoing Board President, Joe Bondi.

84.  In July 2020, Ms. Della Ducata complained of the discriminatory and harassing treatment to Mr. Hesenthaler, the Human Resources Chair of the Board.

85.  When Ms. Della Ducata relayed the harassing, discriminatory and threatening comments made by the Board, Mr. Hesenthaler informed her that she needed to "work it out" with the Board if she wanted to remain employed at FSA.

86.  Thus, FSA took no helpful or supportive action whatsoever in response to her complaints, and instead, shifted the blame and responsibility onto Ms. Della Ducata.

87.  Due to the complete lack of any appropriate response by FSA, by letter dated August 18, 2020, Ms. Della Ducata, through her counsel, again complained of the discriminatory and harassing treatment she had been experiencing at FSA by certain Board members.

88.  The August 18, 2020 letter further noted that Ms. Della Ducata was ready, willing and able to continue to successfully fulfill her duties and responsibilities as CEO of FSA and Administrator for Bucks Villa, but requested that the discrimination and harassment against her cease immediately, with no acts of retaliation in response to her complaints.

89.  FSA failed and/or refused to respond to the August 18, 2020 letter from Ms. Della Ducata's counsel, or her counsel's follow up email on August 20, 2020.

90.  FSA also failed and/or refused to investigate or address in any way Ms. Della Ducata's complaints of discrimination and harassment that she had been subjected to by certain members of the FSA Board.

91.     Thereafter, FSA engaged in immediate and blatant retaliation against Ms. Della Ducata for her complaints.

92.     Initially, after receiving the letter from Ms. Della Ducata's counsel, the Board indicated its refusal to abide by the terms of the letter.

93.     The August 18, 2020 letter specifically states that, to the extent the Board wished to discuss the contents of the letter, that they were to direct all such communications directly to Ms. Della Ducata's counsel.

94.     Notwithstanding the foregoing, immediately upon receipt of the letter, Gary Lux, newly elected Board President, called Ms. Della Ducata's Administrative Assistant, Nancie Miller, and demanded to speak with Ms. Della Ducata right away "about the letter the board received from her attorney."

95.     Ms. Della Ducata's counsel then reiterated that all communications regarding the letter were to go through her, and Ms. Della Ducata herself emailed the Board to state that she was only to be contacted with matters relating to FSA business.

96.     Contrary to the explicit directives of the August 18, 2020 letter, the Board nevertheless continued to attempt to contact Ms. Della Ducata, through her assistant, regarding her complaints of discrimination and harassment.

97.     In fact, Mr. Lux left several voice messages for Ms. Miller and inappropriately informed Ms. Miller about the letter from Ms. Della Ducata's counsel, questioning whether there was any "trouble" at FSA.

98.     This inappropriate relay of confidential information from Ms. Della Ducata's counsel was yet another retaliatory effort by FSA to tarnish her name and reputation amongst FSA staff.

99.     The retaliation only intensified from that point on.

100.    In the days following the August 18, 2020 letter, Ms. Della Ducata sent several business-related emails to the Board. She received no response.

101.    Ms. Della Ducata was also notified that the Board had taken a vote, without her inclusion, regarding a particular project on which she had been working, and stated that they would be taking over the project.

102.    In the most blatant act of retaliation, on August 28, 2020, only ten days after Ms. Della Ducata's counsel sent FSA a letter regarding her concerns of discrimination and harassment, Ms. Della Ducata was terminated.

103.    Notably, Ms. Della Ducata was terminated only two months after she had received a salary increase and bonus for her excellent performance.

104.    The Board had no legitimate reason to terminate Ms. Della Ducata.

105.    Any "concerns" that the Board may have purported to have, such as Ms. Della Ducata's alleged "resistance" to comply with FSA policies, unwillingness to listen to the Board, and a "tendency" for her to "come across as condescending and arrogant," only indicate the Board's displeasure at Ms. Della Ducata's independent nature and refusal to allow the Board to perform her responsibilities, and are examples of the "Philly style" that the Board harbored animus towards – specifically, a strong, independent and accomplished Italian-American female.

106.    FSA also could not claim that Ms. Della Ducata failed to comply with requests for more details on her husband's employment agreement. Ms. Della Ducata absolutely discussed the value of Mr. Della Ducata's services with the Board Chair, Joe Bondi, and it was decided that the issue would be brought to the Executive Committee of the Board for

discussion and approval, which occurred in the March 2019 Executive Committee Meeting.

107.   Then again in the December 2019 full Board Meeting, there was a lengthy conversation regarding the needs of the agency regarding construction and facilities management, along with full disclosure as to what Mr. Della Ducata was assigned to do and he was reporting to COO Marlene Piasecki and not to Ms. Della Ducata. It was even noted by the Board after the discussion that Mr. Della Ducata was providing valuable services at a significantly reduced rate.

108.   Thereafter, Ms. Della Ducata had two separate conversations about workforce planning and reorganization plans with Mr. Hessenthaler, HR Board Committee Chair in or around June and/or July 2020.  Among other topics discussed were changes to Mr. Della Ducata's position, employment hours, and change in reporting to the new COO, Julie Dees.  Mr. Hessenthaler sent a memo to the HR Board Committee regarding these conversations and highlighting, among other HR matters, the changes in Mr. Della Ducata's position and working hours.

109.   To the extent that the Board and Ms. Della Ducata lacked effective communication, such fault lies entirely on the Board, as Ms. Della Ducata had consistently emailed the Board to keep them apprised of FSA matters, only to receive a minimal response or no response whatsoever.

110.   Moreover, in terminating Ms. Della Ducata, certain Board members came to her office unannounced to deliberately humiliate her by attempting to escort her off the premise.

111.   To their surprise, Ms. Della Ducata happened to be working remotely at that time and was not physically present in the office.

112.    As a result, Board President, Gary Lux left a message on her voicemail and emailed her to notify her that she had been terminated, effective immediately.

113.    Ms. Della Ducata had been working at the time, and specifically, had been on a Zoom call with the Interim, Development Director.

114.    However, her computer access was turned off immediately, which resulted in the shutdown of her access during the Zoom call.

115.    This further demonstrated the Board's desire for retaliation and humiliation.

116.    Despite having committed the ultimate act of retaliation against Ms. Della Ducata by wrongfully terminating her for requesting that the harassment and discrimination cease, FSA's acts of retaliation continued.

117.    After her termination, counsel for Ms. Della Ducata requested that her personal belongings be available for her to retrieve.

118.    Notably, other employees who had been terminated were permitted to clear out their office and retrieve their personal belongings, while Ms. Della Ducata was not.

119.    After several requests by her counsel, Ms. Della Ducata was ultimately permitted to return to the office, supervised by FSA staff and Board Secretary Brad Phillips, to obtain her personal and business items.

120.    However, FSA had already gone through her locked office door, locked desk and locked cabinets to take certain personal property belonging to Ms. Della Ducata.

121.    This included, among other things, pink and white note cards, a black spiral notebook labeled "Dina personal," two thumb drives with personal information in a Ziploc bag, personal training files including certificates of completion and other business-related folders.

122.  Ms. Della Ducata also noted that FSA had ripped out all pages of her personal notebooks which contained handwritten notes.

123.  Moreover, although FSA's counsel scanned and sent Ms. Della Ducata's notes, it was clear to Ms. Della Ducata that her notes had been tampered with, as certain pages had been omitted and various notes had been added and/or altered.

124.  In fact, FSA admitted that, before letting Ms. Della Ducata on the premises, two FSA employees went through her office and removed numerous files and items.

125.  Notably, included within the missing items were Ms. Della Ducata's personal notes on her plans for FSA, which have been implemented by current acting CEO, Julie Dees.

126.  Ms. Della Ducata, through her counsel, repeatedly requested a full list of all items taken by FSA from Ms. Della Ducata's office, including her locked drawers, as well as additional information regarding those involved in preparing the list and when the list was prepared.  FSA refused to provide any such information.

127.  Ms. Della Ducata also demanded that FSA return all of her personal property immediately, and that FSA certify that all copies were destroyed and not shared or retained. FSA refused to provide any such information.

128.  Ms. Della Ducata, through counsel, directed that FSA send all files to her counsel for her review.

129.  Notwithstanding her directive, FSA's counsel acknowledged that he had already reviewed the personal files and notes belonging to Ms. Della Ducata, and admitted that they may have included privileged attorney client information.

130. In the meantime, Ms. Della Ducata attempted to contact her former assistant, Nancie Miller, regarding her personal property and information, but FSA instructed Ms. Miller not to speak with Ms. Della Ducata.

131. FSA also has improperly withheld accrued but unused vacation pay of over 200 hours, as reflected on her pay stub, that is owed to Ms. Della Ducata.

132. This is further evidence of the discriminatory and retaliatory animus held against Ms. Della Ducata.

133. In yet another demonstration of the discriminatory animus held against Ms. Della Ducata, despite all of Ms. Della Ducata's tremendous accomplishments for the organization during her tenure, FSA barely acknowledged Ms. Della Ducata's departure.

134. At the time that Gary Lux left a message terminating Ms. Della Ducata on August 28, 2020, he stated that he would work with her and her attorney on a public statement to be released on Monday August 31, 2020 regarding her departure.

135. Mr. Lux directed Ms. Della Ducata to submit her draft statement in writing by the evening of August 30, 2020. However, instead of waiting for Ms. Della Ducata's proposed language for August 30, 2020, Mr. Lux sent an email on the afternoon of August 28, 2020, which stated that Julie Dees was now the Acting CEO of FSA, with no mention of Ms. Della Ducata.

136. This left the FSA staff and the community puzzled and confused, in that some individuals were questioning the well-being of Ms. Della Ducata especially given that the prior CEO had passed away unexpectedly and given the Covid-19 pandemic.

137.   This was yet another deliberate act to negatively impact Ms. Della Ducata's reputation and professional standing with the staff of FSA, business colleagues, political leaders, donors and the community at large.

138.   Ultimately, after speaking with Ms. Della Ducata's counsel, FSA released another statement on September 1, 2020. However, it was a general statement that barely mentioned Ms. Della Ducata's departure nor any of her accomplishments, and which again noted that Julie Dees would be Acting CEO of FSA.

139.   Conversely, when a male employee departed FSA, an email went out to FSA staff and the community that the individual was an "important part" of FSA, had "made so many important contributions" and that the "impact he has made here will not soon be forgotten."

140.   The email concluded "Thank you Dan, for your years of service to FSA and the community. You will be missed very much, and we wish you all the best!"

141.   The difference in this message and Ms. Della Ducata's departure message, and the clear attitude towards Ms. Della Ducata as compared to this male employee, could not be more apparent.

142.   The Board engaged in further acts of harassment, discrimination, and retaliation after terminating Ms. Della Ducata by purchasing a biased and one-sided report from Joseph Barbagallo, CPA, which "report" makes false, unsupported, overly aggressive accusations against Ms. Della Ducata.

143.   Notably, FSA paid substantial sums to an accountant when those funds should have gone to providing emergency services to the innumerable needy individuals, including

homeless and underserved individuals in Bucks County (which FSA claims to be so devoted to) to justify her termination.

144. In addition to hiring Mr. Barbagallo to attempt to substantiate FSA's termination of Ms. Della Ducata, FSA also paid Mr. Barbagallo to review Ms. Della Ducata's "personal financial transactions during her tenure as CEO," which included a review of her use of a company car, use of a company credit card, renovations to her office, retention of select consulting firms for FSA, and her husband's use of FSA vehicles during his employment.

145. All of the purported results of Mr. Barbagallo's "investigation" are blatantly false, unsubstantiated and/or grossly mischaracterized.

146. For example, with respect to Ms. Della Ducata's use of a company car, Ms. Della Ducata never used a company car and only used the gas card when she did not submit her mileage. She was specifically directed to submit back mileage and related business expenses for reimbursement (which was specifically approved by the Board).  Ms. Della Ducata had legitimate business reasons for all of her business-related travel and/or expenses and properly submitted her mileage and/or applicable receipts for reimbursement for company related travel and business expenses.

147. With respect to use of a company credit card, all of Ms. Della Ducata's expenses were proper business-related expenses including receipts, and any implication to the contrary is simply another attempt by FSA to retaliate against her and an inappropriate effort to inflict damage upon Ms. Della Ducata's professional character.

148. With respect to renovations to the CEO's office, while the CEO office was renovated, it was done so as an overall plan for improvements to the main office, as several other areas of the building were renovated as well. The cost of these overall improvements was

included in the FY 2018/2019 Board approved budget.  In addition, the approved year

end financial statements for FY 2018/2019 reflected those expenses as well..

149.   With respect to retention of select consulting firms on behalf of FSA, such firms were

necessary for the advancement and success of FSA and in no way benefitted Ms. Della

Ducata personally. For example, Dunleavy and Associates provided several different

areas of support and services to FSA, which included, among other things, an assessment

of the Development Department, support for development activities, day-to-day

management, and recruitment for two staff vacancies; the O'Conner Group had been

hired, at a low cost, to fill the Director of HR position, which had been a difficult role to

fill; and Triad Strategies was hired to provide technical support for a federal grant that

FSA had submitted. The retention and use of these consulting firms was practical and

efficient, and not improper in any way.

150.   With respect to Mr. Della Ducata's use of FSA vehicles, Mr. Della Ducata did not violate

any transportation policy, as he had requested the use of an agency vehicle for agency-

related travel during the Covid-19 pandemic where numerous agency vehicles were on

the lot and not being used, and was specifically authorized by his supervisor and COO at

the time, Julie Dees.

151.   Ms. Della Ducata also did not engage in any misconduct or inappropriate behavior with

respect to her time spent working.  While the report criticizes Ms. Della Ducata's start

time on certain days, it fails to note the time she left each day and fails to acknowledge

that Ms. Della Ducata's position did not have a set start time and end time.  Finally, the

report fails to acknowledge the significant time Ms. Della Ducata spent working

remotely, outside of the office, which would not be reflected on her time cards.  Notably,

Ms. Della Ducata's position was exempt and she only clocked in and out to keep track of time spent in the office. She documented the time she spent away from the office working remotely, even though not required to do so given that she was exempt.

152. This overly scrutinized review of every expenditure made during Ms. Della Ducata's employment is, at best, clear evidence that the Board simply cannot stop itself from repeatedly and egregiously retaliating against Ms. Della Ducata.

153. Even more egregiously, after wrongfully terminating Ms. Della Ducata in retaliation for her complaints of discrimination and harassment, and seizing her personal property, FSA continued further to retaliate against Ms. Della Ducata by subjecting Ms. Della Ducata's husband, Salvatore Della Ducata, FSA's Facilities & Projects Manager, to severe and extreme acts of retaliation.

154. This position required Mr. Della Ducata to be on call due to 24-hour facilities and after-hour emergencies, and Mr. Della Ducata routinely had access to the facilities at all times.

155. Nonetheless, on August 31, 2020, the Monday after Ms. Della Ducata was terminated, Mr. Della Ducata arrived at work around 6:45 a.m. to meet with contractors at 7 a.m. regarding an expansion of the Food Pantry in the Langhorne main facility.

156. Mr. Della Ducata's access fob did not work, as it should have and always did, prior to his wife's complaints of discrimination and harassment.

157. Mr. Della Ducata contacted the acting CEO, Ms. Dees at approximately 6:50 a.m. regarding his inactive fob.

158. He was informed that his full access to the facilities had been cut off and that his new access would be restricted from only to 7:30 a.m. to 10 p.m., which was restricted further

only one week later to 8:00 a.m. to 10:00 p.m., despite the responsibilities of his position requiring on-call 24-hour coverage of the facilities.

159.   Mr. Della Ducata also experienced other severe acts of retaliation by FSA after Ms. Della Ducata's complaints of discrimination and harassment.

160.   For example, later on August 31, 2020, Ms. Dees questioned Mr. Della Ducata regarding his plans to remain at FSA, asking him what he wanted to do considering what had happened with Ms. Della Ducata.

161.   Apparently to the surprise and disappointment of FSA, Mr. Della Ducata indicated that he intended to remain at FSA and that he was there to work.

162.   Mr. Della Ducata was also intentionally and purposefully excluded from important meetings that fell within his responsibilities and for which he should have been present.

163.   Among other things, the Board and Management purposefully excluded Mr. Della Ducata from involvement in a grant funded expansion project, which was Mr. Della Ducata's responsibility, was prevented from speaking directly to vendors as he always had, and was completely excluded from an ongoing project regarding virtual learning.

164.   In addition, Mr. Della Ducata was suspended and issued a "final warning" (despite never having received even a first warning) for "raising his voice," even though other FSA employees, such as Ms. Maria Piacotti and Ms. Gita Krull, had engaged in similar behavior with no repercussions.

165.   On another occasion approximately two months prior to his alleged layoff, Mr. Della Ducata approached the Director of Human Resources requesting a dental enrollment form because he needed to see a dentist.  The Director of Human Resources told Mr. Della Ducata that he had better "get it done soon."

166.   Ultimately, in October 2020, less than two months after Ms. Della Ducata's termination, Mr. Della Ducata was himself terminated on the alleged grounds that his position was no longer needed, even though he had been consistently told that he was an excellent employee and even though his position was specifically approved in both the FY19/20 budget and the FY20/21 budget.

167.   It could not be clearer that, once Ms. Della Ducata complained through her counsel about the harassment and discrimination she had been experiencing, FSA had a premediated plan to oust both Ms. Della Ducata and Mr. Della Ducata – and successfully executed on that plan.

168.   Most recently, in even further acts of retaliation, immediately following Ms. Della Ducata's counsel's notice to FSA that Ms. Della Ducata intended to file a Charge of Discrimination with the EEOC, FSA further retaliated against Ms. Della Ducata by engaging a third party to "audit" Ms. Della Ducata's vacation time and financial transactions, and falsely alleged that Ms. Della Ducata had made unapproved expenditures and falsified her time records.

169.   FSA cites this falsified "audit" as grounds for its wrongful refusal to pay Ms. Della Ducata for her earned time. These are further actions taken by FSA to harass and retaliate against Ms. Della Ducata.

170.   FSA relied on the falsified audit to claim that Ms. Della Ducata had been terminated for cause and used this for a basis to refuse to pay Ms. Della Ducata the severance pay and COBRA reimbursement owed pursuant to her offer letter, in breach of its promises to Ms. Della Ducata and in violation of the WPCL.

171.   Ms. Della Ducata was not terminated for cause, and the offer letter entitles her to payment for six months of base salary and six months of COBRA reimbursement.

172.   Additionally, since her employment ended, FSA has failed and refused to pay Ms. Della Ducata for earned but unused accrued vacation pay in violation of its promises in the offer letter and in violation of the WPCL.

173.   The Board of Directors made a unanimous decision to withhold and refuse to pay Ms. Della Ducata's earned wages.  The Board members involved in that unanimous decision include Gary Lux, Deborah Van Aken, Subrenie Thomas Smith, Joseph Stoll, Fred Hessenthaler – Human Resources Committee Chair, Brad Phillips – Secretary, Frank Sullivan, Gwen Scott-Hodges, Bernadette Handler, Margaret Mohr, Alice Cahill Gens, Mark Cappuccio, William E. Clark, Sonja Foster-Storch, and Christine Zador-Silverman.

174.   Given her treatment during her employment with FSA, particularly in spite of her excellent work performance and significant achievements, the clear discriminatory and harassing treatment experienced by Ms. Della Ducata, and the egregious acts of retaliation against Ms. Della Ducata and her husband, Salvatore Della Ducata, Ms. Della Ducata maintains that she has been subjected to harassment and discrimination on the basis of her sex and national origin and to retaliation for her complaints about discrimination and harassment.

175.   Ms. Della Ducata has been discriminated against and harassed on the basis of her sex and national origin, and was retaliated against for her complaints of discrimination and harassment, in violation of Title VII of the Civil Rights Act of 1964, as amended by the Civil Rights Act of 1991, 42 U.S.C. § 2000(e) et seq.

176.   Defendant FSA breached its contract with Ms. Della Ducata by failing to pay her the severance and COBRA reimbursement as promised and in failing to pay her for her earned but unused vacation pay.

177.   Plaintiff fully performed her obligations under the offer letter.

178.   Defendant FSA's failure to perform its contractual obligations is without excuse or justification.

179.   In failing to pay Ms. Della Ducata her earned wages including severance pay, COBRA reimbursement, and earned but unused vacation pay for a period more than thirty days beyond regularly scheduled paydays, Defendant FSA violated the WPCL.

180.   Gary Lux, Deborah Van Aken, Subrenie Thomas Smith and Joseph Stoll were decision-makers with respect to the decision to withhold Ms. Della Ducata's earned wages and are personally liable pursuant to the WPCL.

181.   Despite Ms. Della Ducata's demand that these payments be made, Defendants have refused to make such payments.

182.   Defendants have not given written notice to Claimant of the amount of wages that they concede to be due, nor paid such amount without condition within the time set by the Pennsylvania Wage Payment and Collection Law.

183.   Ms. Della Ducata has suffered and continues to suffer mental anguish and severe emotional distress as a proximate result of the actions and inactions of Defendant.

184.   Defendant FSA and its employees acted with the intent of causing, or in reckless disregard of the probability, that their actions would cause Ms. Della Ducata severe emotional distress.

185. Ms. Della Ducata has suffered financial and other losses including, among other things, lost wages, an obligation for attorneys' fees and costs of bringing suit, and irreparable injury to her professional reputation as a direct and proximate result of the actions and inactions of Defendants.

**COUNT I**
**Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000(e), et seq.**
**(Plaintiff v. Family Service Association of Bucks County)**

186. Plaintiff Dina Della Ducata repeats and incorporates by reference the allegations of all preceding paragraphs as if fully set forth at length herein.

187. Based on the foregoing, Defendant engaged in unlawful employment practices in violation of Title VII of the Civil Rights Act of 1964, as amended by the Civil Rights Act of 1991, 42 U.S.C. § 2000(e) et seq.

188. In discriminating against and harassing Ms. Della Ducata because of her sex and national origin, and retaliating against Ms. Della Ducata for her complaints about discrimination and harassment, Defendant violated Title VII.

189. Defendant's violations were intentional and willful.

190. Defendant's violations warrant the imposition of punitive damages.

191. As a direct result of the unlawful employment practices engaged in by Defendant, Plaintiff Dina Della Ducata has sustained a loss of earnings, severe emotional and psychological distress, loss of self-esteem, loss of future earning power, as well as back pay, front pay and interest due thereon.

192. Plaintiff is suffering and will continue to suffer irreparable harm and monetary damages as a result of Defendant's actions unless and until this Court grants the relief requested herein.

## COUNT II
### Breach of Written Contract
### (Plaintiff v. Family Service Association of Bucks County)

193. Plaintiff repeats and incorporates by reference the allegations of all previous paragraphs as fully as though the same were set forth at length herein.

194. Plaintiff and FSA entered into a written contract – the offer letter.

195. Pursuant to the terms of the offer letter, Ms. Della Ducata was entitled to a severance payment of six months of base salary and six months of reimbursement for COBRA continuation coverage in the event she was not terminated for cause.

196. Pursuant to the terms of the offer letter, Ms. Della Ducata was entitled to paid time off including vacation pay that Ms. Della Ducata was entitled to carry over from year to year to the extent it was not used during the year it was accrued, for a period of 24 months.

197. Defendant FSA breached its agreement with Plaintiff by failing to pay severance pay, reimbursement for COBRA coverage and accrued time off in accordance with the offer letter.

198. Plaintiff fully performed her obligations pursuant to the offer letter.

199. Plaintiff seeks damages for breach of the offer letter.

200. As a direct and proximate result of the Defendant FSA's breaches, Plaintiff has suffered, and continues to suffer financial losses.

201. Defendant FSA's conduct is without excuse or justification.

## COUNT III
### Breach of Verbal or Implied Contract
### (Plaintiff v. Family Service Association of Bucks County)

202. Plaintiff repeats and incorporates by reference the allegations of all previous paragraphs as fully as though the same were set forth at length herein.

203.   Count III is pled in the alternative to Count II, in the event a valid and enforceable written contract is not found to exist.

204.   The Parties reached a verbal or implied Agreement (the "Agreement") whereby Ms. Della Ducata was to be paid a severance payment of six months of base salary and six months of reimbursement for COBRA continuation coverage in the event she was not terminated for cause and whereby Ms. Della Ducata was entitled to paid time off including vacation pay that Ms. Della Ducata was entitled to carry over from year to year to the extent it was not used during the year it was accrued, for a period of 24 months.

205.   Defendant FSA breached its agreement with Plaintiff by failing to pay earned wages including severance pay, COBRA reimbursement and accrued time off in accordance with the offer letter.

206.   Plaintiff fully performed her obligations pursuant to the offer letter.

207.   Plaintiff seeks damages for breach of the offer letter.

208.   As a direct and proximate result of the Defendant FSA's breaches, Plaintiff has suffered, and continues to suffer financial losses.

209.   Defendant FSA's conduct is without excuse or justification.

### COUNT IV
**Pennsylvania Wage Payment and Collection Law
(Plaintiff v. All Defendants)**

210.   Plaintiff repeats and incorporates by reference the allegations of all previous paragraphs as fully as though the same were set forth at length herein.

211.   Defendants violated the Pennsylvania Wage Payment and Collection Law ("WPCL") when they failed to pay Ms. Della Ducata her earned wages, including her severance compensation, COBRA reimbursement and accrued but unused vacation pay, within the

time specified by law.

212.   At all relevant times, Defendants were employers within the meaning of 43 Pa. C. S.

260.2(a) of the WPCL.

213.   At all relevant times, Defendants Gary Lux, Deborah Van Aken, Subrenie Thomas Smith

and Joseph Stoll were persons and/or employers within the meaning of 43 Pa. C. S.

260.2(a) of the WPCL, and active decision-makers with respect to Ms. Della Ducata's

unpaid wages.

214.   At all relevant times, Defendant FSA was an employer within the meaning of 43 Pa. C. S.

260.2(a) of the WPCL with respect to Ms. Della Ducata's unpaid wages.

215.   Defendants willfully failed to pay Ms. Della Ducata's wages earned as defined by the

WPCL during the course of her employment or within the time limits prescribed by the

WPCL.

216.   Following the cessation of Ms. Della Ducata's employment, Defendants willfully failed

to pay her wages earned within the time limits prescribed by the WPCL.

217.   Defendants have failed to pay wages due for a period in excess of thirty (30) days beyond

regularly scheduled paydays.

218.   As the direct and proximate result of Defendants' violation of the Pennsylvania Wage

Payment and Collection Law, Plaintiff has sustained a loss of earnings, liquidated

damages, and interest due thereon and has incurred attorneys' fees and costs.

**COUNT V**
**Promissory Estoppel/Detrimental Reliance**
**(Plaintiff v. Family Service Association of Bucks County)**

219.   Plaintiff repeats and incorporates by reference the allegations of all previous paragraphs

as fully as though the same were set forth at length herein.

220. Count V is pled in the alternative to Count II, in the event a valid and enforceable written contract is not found to exist.

221. Defendant FSA promised that Ms. Della Ducata was to be paid a severance payment of six months of base salary and six months of reimbursement for COBRA continuation coverage in the event she was not terminated for cause and whereby Ms. Della Ducata was entitled to paid time off including vacation pay that Ms. Della Ducata was entitled to carry over from year to year to the extent it was not used during the year it was accrued, for a period of 24 months.

222. Plaintiff reasonably relied upon these promises to her detriment by working tirelessly and providing her expertise to FSA in carrying out her job duties for FSA.

223. Defendant FSA did not honor its promises, as FSA has failed and refused to pay Ms. Della Ducata her severance compensation, COBRA reimbursement or accrued vacation pay.

224. For the reasons set forth above, Defendant FSA is liable to Plaintiff under a theory of Promissory Estoppel or Detrimental Reliance.

## <u>COUNT VI</u>
**Unjust Enrichment**
**(Plaintiff v. Family Service Association of Bucks County)**

225. Plaintiff repeats and incorporates by reference the allegations of all previous paragraphs as fully as though the same were set forth at length herein.

226. Count VI is pled in the alternative to Count II, in the event a valid and enforceable written contract is not found to exist.

227. Plaintiff conferred benefits upon Defendant FSA by working tirelessly and providing her expertise to Defendant FSA in carrying out her job duties.

228. Defendant FSA appreciated the benefits conferred by Plaintiff.

229. Defendant FSA accepted the benefits of Plaintiff working tirelessly and providing her expertise to Defendant FSA in carrying out her job duties.

230. Defendant FSA accepted the benefits conferred on them by Plaintiff under circumstances that would make it inequitable for Defendant to retain such benefits without payment of value to Plaintiff.

231. Defendant FSA agreed to the value of the benefits conferred upon them by Plaintiff.

232. Defendants have not paid Ms. Della Ducata her severance pay, COBRA reimbursement or accrued but unused vacation pay.

233. For the reasons set forth above, Defendant FSA is liable to Plaintiff under a theory of Unjust Enrichment.

## **PRAYER FOR RELIEF**

234. Plaintiff Dina Della Ducata repeats and incorporates by reference the allegations of all previous paragraphs as if fully set forth at length herein.

WHEREFORE, Plaintiff Dina Della Ducata respectfully requests that this Court enter judgment in her favor and against Defendant, and Order:

    a. Appropriate equitable relief;

    b. Defendant FSA compensate Plaintiff with a rate of pay and other benefits and emoluments of employment to which she would have been entitled had she not been subjected to unlawful discrimination, harassment and retaliation;

    c. Defendants compensate Plaintiff with the wages and other benefits and emoluments of employment lost due to Defendant's unlawful conduct;

    d. Defendant FSA pay Plaintiff punitive damages;

e.   Defendants pay Plaintiff liquidated damages;

f.   Defendant FSA pay Plaintiff compensatory damages for future pecuniary losses, pain and suffering, inconvenience, mental anguish, loss of employment and other nonpecuniary losses as allowable;

g.   Defendants pay Plaintiff's costs of bringing this action, including, but not limited to, Plaintiff's reasonable attorneys' fees;

h.   Plaintiff be granted any and all other remedies available pursuant to Title VII, the WPCL, Pennsylvania common law or any other applicable law; and

i.   Such other and further relief as is deemed just and proper.

## **JURY DEMAND**

Plaintiff hereby demands trial by jury as to all issues so triable.

*/s/ Jennifer C. Bell*
Jennifer C. Bell, Esquire
Christopher A. Macey, Jr., Esquire
Bell & Bell LLP
One Penn Center
1617 JFK Blvd. – Suite 1254
Philadelphia, PA  19103

*Attorneys for Plaintiff Dina Della Ducata*

Dated:  August 4, 2021